JOYNES, J.
I think it may fairly be inferred from the facts stated by agreement of the parties, that the bond on which this action is founded was, according to the true understanding and agreement of the parties, to be paid in Confederate treasury notes; or, to speak more accurately, that these note were the sort of dollars and cents for which the bond was given. The District Court, proceeding *upon the familiar principle applicable to a special verdict and to a case agreed to be argued in lieu of a special verdict, held that it was not competent for a court to make this inference from the facts stated. But this was not a case agreed to be argued in lieu of a special verdict, as in Sawyer v. Corse, 17 Gratt. 220, where the court could not do otherwise than apply to the case the same rules that would have been applied to a special verdict. In this case the whole matter of law and fact was submitted to the court in pursuance of the statute. The facts stated by agreement of the parties were submitted to the court, without any restriction as to the mode in which they should be treated. It was, therefore, competent for the court to make such inferences from the facts thus submitted to it as the jury might have made from the same facts, if they had been submitted to them. There was, therefore, no necessity for a venire de novo, and it was error in the District Court to award it.
The first point decided by the District Court is thus stated in the judgment:
“That upon the facts stated in the case agreed, the bond, executed by the plaintiff in error to the testator of the defendant in error, on the 14th day of June, 1862, and on which this action is founded, ought to be regarded, for the purposes of this action, as a new transaction, unaffected by the previous dealings between the parties, which had been fully closed and settled before the execution of said bond.”
The obvious meaning of the court was, that no part of the consideration of the bond should be regarded as a specie debt, and that no part of it should be scaled as of a time anterior to the date of the bond. The parties had a full settlement, in which interest was credited to Dearing upon the money that had remained in Rucker’s hands. The sum found due to Dearing, principal and interest, was *$3,822.74; for this sum Rucker gave Dearing his check, which he accepted in payment, and Rucker balanced the accounts on his book.
Subsequently, on the same day, this check was handed back to Rticker, who executed his bond for the said sum of $3,822.74, with interest thereon from that day. All previous interest was thus aggregated with the capital, and made to bear interest. The settlement was not cancelled in effect, for then interest should have run upon each separate part of the consideration from its date, as if there had been no settlement. On the contrary, the bond was given on the footing of a settlement completely made, remaining undisturbed, and affording a new starting point for interest. If we should hold that one part of the aggregate sum for which the bond was given should be treated as a specie debt, and that other parts of it should be scaled as of different dates, or that any part of it should be scaled as of a date prior to the date of the bond,, we should undo what the parties have agreed between themselves. The agreement of Dearing to accept the check in payment, which if presented at the bank would have been paid in Confederate notes, was an agreement to accept such notes, as of that date, in satisfaction of his claim. The case must be treated, therefore, as a loan of Confederate notes at the date of the bond, payable in Confederate notes on the 1st day of January, 1863, with four per cent, interest.
The next point decided is thus stated in the judgment:
“2d. That if, according to the true intent of the parties to the said bond, the same was payable in Confederate States treasury notes, then, upon the facts agreed, the defendant in error is entitled to recover judgment in this action for the value of the amount of such Confederate notes, payable on said bond, scaled according to the value of said notes, with reference to-gold, on the 1st day of * January, 1863; the case agreed not furnishing the materials for applying any other scale, if any other ought to be applied in this or in any case, as to which the court expresses no opinion; and that, to the value so ascertained, nothing should be added on account of the present depreciation of paper money as compared with gold. The court can only render judgment for money generally, without designating what is to be regarded as money; and no question can arise as to the obligation, on the part of defendant in error, to accept payment in United States treasury notes as being, under the act of Congress, the legal equivalent of coin, until such notes shall have been tendered in payment of said judgment and refused; and the effect of so adding to the money value of said notes a sum equal to the difference, at the date of the judgment, between coin and paper money, would be to make the debtor pay more or less than he ought to pay, in proportion to the rise or fall in value of paper money with reference to coin, between the date of the judgment and the time of its payment.”
This involves two distinct propositions : 1. That the Confederate notes should be reduced to their value in gold on the 1st day of January, 1863; the day on which the bond was payable. 2. That to the value of the Confederate notes, thus ascertained,
*672 nothing' should be added on account of the present depreciation of current paper money-compared with gold.
X do not understand that the latter proposition is controverted, and I think it manifestly sound for the reasons assigned by the District Court. The same views were held in an analogous case by the Supreme Court of Missouri, in Henderson v. McPike, 35 Mo. R. 225.
No question has been raised as to the propriety of adopting gold as the standard with reference to which the Confederate notes should be valued. The facts agreed do not *furnish the materials for applying any other standard in this case, if any other would be proper, and they indicate that the parties intended that the gold standard should be applied, if the debt was to be scaled at all. Gold, it is well known, was not a currency, but an article of traffic, during the late war. Scarcely any article had a value that was less stable and uniform. It went up, and sometimes went down, for short periods, very suddenly, according to the vicissitudes of the war and the demands of speculation and adventure. Its value was not uniform in different places at the same time. At points remote from the cities, the people paid little or no attention to its fluctuations, and were not governed in their dealings by any reference to its value.
There would seem, therefore, to be strong ground for saying, that gold does not fulfil the conditions necessary for an absolute standard, the most essential of which are uniformity and stability. But it is a convenient and practicable standard, and answers the purpose as well as any other that can be found; perhaps better than any other. At any rate, it is the standard generally adopted, and will be adhered to from convenience, and almost from necessity; for the dispatch of business requires that some standard should be assumed, and one that is capable of prompt and easy application. While X think that gold is not legally or logically the true and only standard for the valuation of Confederate notes, I have no disposition, for the reasons which I have mentioned, to disturb the practice which prevails, as far as I know, in all parts of the State. The important question in this case relates to the time at which the value of the Confederate notes should be ascertained. The case is of the first impression in this court. To determine it properly, it will be necessary to examine with care the principles which are applicable to this class of contracts.
*The act of March 3, 1866, which was in force when this case was decided in the Circuit Court and in the District Court, provided that .the court should, in every case, determine the time at which the value of the Confederate notes should be ascertained. By the act of 1781, (10 Hen. Stat. at Barge 471), establishing a ■scale of depreciation for Continental money, and providing a rule for the adjustment of contracts made with reference to that currency, an arbitrary rule was prescribed by which the scale was to be applied in all cases “at the days or times” the debts or contracts “were incurred or entered into.” I take no notice now of the provision of the fifth section of that act, to which I will advert hereafter. That act was passed before the adoption of the Federal constitution. There was nothing in the then existing constitution of the State, or in the articles of confederation, to prevent the Legislature from fixing an arbitrary and uniform rule for all cases, though it might often have the effect of controlling the agreement of the parties. We shall see hereafter, however, when I come to consider this act more particularly, that it was designed to carry into effect the real contract of the parties, and it would probably not have been liable to objection, if this provision of the constitution had then been in force.
However this may be, it was certainly not competent for the Legislature, in 1866, to pass any law impairing the obligation of a contract. Where the rights of parties have been fixed bjT their contract, no legislation can modify or control them, in any manner or to any extent. This is equally true, whether the terms of the contract are expressed in words or implied by law. And, accordingly, the act of March 3, 1866, as I understand it, laid down no general rule, but provided that the scale should be applied at the date of the contract, or at another time, 1 ‘as may to the court seem right in the particular case.”
*The language of the act has been supposed to indicate that the Legislature intended to prescribe, as a general rule, that the notes shall be valued at the date of the contract, allowing an exception to be made when the justice of a particular case may require it. The form of expression may afford some support to this construction, but it does not by any means require it. And we are not at liberty, by “sticking in the bark” of a mere form of expression, to impute to the Legislature an intention to exceed the limit of its powers, when 'the language is consistent with a different construction.
It is apparent that, in referring the time at which the notes shall be valued to the decision of the court, the Legislature regarded it as a question depending on the legal rights of the parties. The Legislature had no authority to make contracts for parties, nor to alter their contracts when fairly made, and it could not confer such authority on the courts. All it could legitimately do was to provide the means of ascertaining what the real contract was, by such modifications of the rules of evidence as might be necessary for that purpose, and the means of giving effect to that contract when ascertained. It accordingly provided, in respect to contracts made after the 1st of January, 1862, for the introduction of parol or other evidence to ascertain the true intention of the parties in respect to the currency in which a contract for the *673 payment of money was to be fulfilled, or with reference to which, as a standard of value, a contract of any other sort was made.
It assumed that a contract for the payment of Confederate money was valid, and that a party might lawfully claim to have it enforced in substance, though it could not to any useful purpose, be enforced in form. No such question has been raised in this case. It left the contract, when its character was ascertained by its terms, or *by evidence aliunde, to be enforced according to its true legal construction and effect, to be determined by the laws applicable to other contracts. It could not have done otherwise, without a violation of the constitution.
The act of March 3, 1866, was modified by the act of February 28, 1867, so as to provide that, in every “jury case,” the jury shall determine the time with reference to which the Confederate money shall be valued. But it will appear, from what I have said, that the jury have not an arbitrary discretion to fix the time as they please. The legislature could not confer such a discretion without a violation of the constitution. Whatever we may speculate about the real purpose of the Legislature, we must, if their language will allow it, impute to them a lawful purpose, and put such a construction upon the act as will make it consistent with the supreme law. There is nothing in the language to prevent such a construction in this case. The jury are only substituted, in reference to this matter, in the place of the court. The time is to be fixed, under this law, by the jury, as under the former law it was to be fixed by the court, in conformity with the true construction of the contract, and the legal rights of the parties under it. It would be a grave error, to suppose that either the Legislature or the courts can disregard the fair and lawful contracts of parties, in order to mitigate their hardship in particular cases. I cannot be tempted by the hardship which often attends the strict enforcement of Confederate contracts, to sanction a principle in respect to them which is wrong in itself, and susceptible of indefinite abuse. If we relieve against such contracts, wholly or in part, we must do .so in accordance with the rules of law applicable to other contracts. We cannot, in such a case, more than any other, substitute another contract for that which the parties have made, because it proves to be a bad bargain to one of them.
'“'Confederate notes were not money, in a legal sense, though they passed as such, like bank notes. In a legal sense, they were like bank notes — a mere commodity. They were a commodity which was measured or “enumerated in dollars and cents,” like lawful money. A contract for the payment of so many dollars in Confederate notes, was a contract to pay so many dollars of Confederate notes, or so many Confederate dollars. The specification of dollars served only to measure the quantity of the notes, so that in every such contract the quantity of notes to be delivered was ascertained, though their value might be uncertain. The contract was for quantity only, and not for value. The remedy for the breach of such a contract is by covenant or assumpsit to recover damages for the failure to deliver the specified quantity of notes, and the measure of damages is the value of the notes at the time when they ought to have been delivered. Beirne v. Dunlap, 8 Leigh 514; Butcher v. Carlile, 12 Gratt. 520. These cases fully establish these principles in reference to contracts for the payment of so many dollars in bank notes. I cannot imagine a reason why they should not apply equally to contracts to pay so many dollars in Confederate notes.
When, therefore, the contract is for the payment of Confederate notes, in express terms, or of so many dollars in Confederate notes, the sum to be recovered in an action upon it is the value of the quantity of notes called for at the day of payment, whether the payment was to be made presently, or, as we say, “on demand,” or at a future day. In other words, the scale of depreciation must be applied at the day when the money was payable.
Then suppose that the real understanding and agreement of the parties is, that the sum to be paid is so many nominal dollars in Confederate notes, but it is expressed on the face to be so many dollars generally, and the real ^'agreement is ascertained by evidence aliunde. Such was the form of almost every contract for Confederate notes. In such a case, I apprehend, debt will lie, because the bond on its face calls for money, and the act of Assembly which allows evidence aliunde to prove the real agreement, does not require that the plaintiff shall be turned out of court, and put to a new action. But the actual contract is the same, in the case now supposed, as if the bond called, on its face, for Confederate notes. In one case, this part of the contract is proved by words inserted in the bond; in the other it is proved by evidence aliunde. And as the object of the law is to give effect to the real contract of the parties, it would seem to follow', of necessity, that the contract must-have the same effect in each of these cases. In the case of a bond calling, in terms, for so many dollars in Confederate notes, at a future day, a tender of that quantity of Confederate notes, or of that number of dollars in Confederate notes, on the day of payment, would satisfy the contract, though they might have depreciated’ since the date of the contract, for the contract is for quantity, not for value. Beirne v. Dunlap, Butcher v. Carlile, ubi supra. And I can imagine no reason why such a tender would not be equally good when the agree-j ment for Confederate notes is not expressed in the bond, but is supplied by evidence aliunde. The agreement of the parties is in all respects the same; the only difference is in the form of proof. The rights and *674 liabilities of the parties depend on their agreement, and not on the evidence by which it is proved.
The result is, that the scale must be applied at the time of payment in all cases where the agreement is that the sum called for is so many nominal dollars in Confederate notes, whether that agreement is expressed on the face of the contract, or is established by evidence aliunde. In Kentucky it was held, in reference to contracts made*during the disastrous era of Commonwealth bank- notes, that a contract for the payment of so many dollars in these notes was a contract to deliver a commodity of a fixed quantity, and that the measure of damages for the breach of it was the value of the notes in specie at the day of payment, in conformity with the decision of this court in. Beirne v. Dunlap. The same rule was applied where the intention in respect to the currency was not expressed in the contract. Thus, where there was a judgment at law upon a note for “two hundred and ten dollars,” dated March 17, 1819, payable April 1, 1820, and upon a bill in equity it was proved that the parties understood and intended that the note should be paid in bank notes, the court gave relief against the judgment on payment of the value of the notes in specie on the 1st day of April, 1820, when the note was payable. Huston’s ex’or v. Noble, 4 J. J. Marsh R. 130; acc., Davis & al. v. Phillips, 7 Monr. R. 632. Where a note was for so many dollars in “current money of Kentucky,” (McCord v. Ford, 3 Monr. R. 166), “in the currency of this State,” (Chambers v. George, 5 Litt. R. 335), “in the common currency of Arkansas,” (Dillard v. Evans, 4 Ark. R. 175), the courts took judicial notice that bank notes were the common currency at the time, and hence inferred that such notes were the currency or sort of dollars contemplated by the parties. But it was never intimated that the measure of recovery in such a case was different from what it would have been if the currency or sort of dollars had been expressed on the face of the contract.
These conclusions must be sound, unless a party who sues now upon a contract for the payment of so many dollars in Confederate notes, whether the agreement as to the kind of dollars is expressed or proved ali-unde, is entitled to receive more, or is bound to accept less, at the. hands of the court than he was entitled to receive at the hands of *the defendant, if the contract had been fulfilled. To give him more would be to compel the defendant to pay more than he agreed to pay; to compel him to accept less, would be to discharge the defendant upon the payment of less than he bound himself to pay. To do either would be to change the contract, not to enforce it. And, accordingly, the general rule in actions founded on a breach of contract is, that “the amount which would have been received, if the contract had been kept, is the measure of damages if it be broken.” Broom Com. 634..
In Robinson v. Noble’s adm’r, 8 Peters’ R. 181, the contract was for the payment of certain freight at so much a barrel, payable on delivery of the goods in paper of the Miami Exporting Company, or its equivalent. The Supreme Court held, that the plaintiff was only entitled to recover the value of the Miami Company’s notes at the time at which they ought to have been paid. These notes purported to be money, and circulated as such, to some extent, in business transactions. The court said: ‘ ‘Robinson failed to make the payment at the time, and is he now bound to pay the nominal amount of these notes in specie? What damage has Noble sustained by the non-payment? Certainly not more than the value of the notes if they had been paid. Had these notes been equal to specie on the day of payment, Robinson was bound to pay them, or what was of equal value. If they had depreciated to fifty cents in the dollar, Noble was bound to receive them in discharge of the covenant. Each party incurred a risk in the fluctuations of the value of the notes specified, and nothing could be more unjust, or more opposed to the spirit and letter of the contract, than to require Robinson to pay in specie the nominal value of these notes. The law affixes no such penalty for default of payment. Robinson can only be held liable to make good the damages occasioned through his default, and the ^specie value of the notes, at the time they should have been paid, is the rule by which such damages are to be estimated.”
It has been said that the principles applicable to commodities cannot apply to Confederate notes, because they had no intrinsic value, were not based on anything of value like the capital of a bank, or convertible into any thing of value like a bank note. But this is fallacious. A gold dollar has intrinsic value, because the metal is valuable without the impress which stamps it as coin. A bank note has no intrinsic value beyond that of the paper on which it is printed. But it has an actual value beyond that, in proportion to the ability of the bank to redeem it. It may not be yet payable, like a post-note, or it may not be possible to convert it into coin at the counter of the bank, but everybody attributes value to it, and will exchange other values for it. It may really be worthless from the insolvency of the bank, and yet pass current as possessing value, because it is not known to be worthless. A United States treasury note has no intrinsic value beyond that of the paper, and it represents no value which can be appropriated to its redemption by means of legal proceedings, like the assets of a bank. But it represents the faith and credit of the United States, in which people confide. So Confederate notes represented the faith and credit of the Confederate States, in which the people confided to the extent that they attributed value to the notes.
It is undoubtedly true, that the parties in this case, and the people generally, dealt *675 ■with Confederate notes, to a certain extent, as money. They regarded their relation as that of debtor and creditor, and not that of buyer and seller. But that was equally true in the case of Beirne v. Dunlap, where the contract was for the payment of so many dollars in “notes of the United States bank or *either of the Virginia banks. ’ ’ The notes of these banks were the common currency of the State, with which the people dealt as money. It was so in the Kentucky cases in reference to contracts payable in Commonwealth bank notes, which was the common currency, and in every other case in which the kind of notes specified is that which was current in the daily transactions of business, fulfilling the common offices of money as a medium of exchange and a measure of value. But this consideration was not allowed to overrule the legal principles applicable to such contracts. Though the people, for convenience or from necessity, treated Confederate notes, as they treated bank notes, as money in their business transactions, the law can only regard them, as it does bank notes, as commodities. And, indeed, it is only by so regarding them that any legal remedy can be afforded upon a contract for the payment of such notes. They cannot be recovered as money; all that can be done is to recover their value as commodities.
How can we sajT that the law in thus regarding Confederate notes disappoints the intentions or the reasonable expectations of the parties? While they dealt with such notes from necessity as money, they knew that they were depreciated in value, and might, and probably would, undergo still further depreciation. Is it possible for us, if we were at liberty to speculate on the subject, to assume that they did not take this into account in their transactions, or that, though they allowed for it, they did not allow enough? EJvery contract for the payment of Confederate notes was essentially a contract of hazard. When property was sold on a credit, the seller might, and probably would, indemnify himself against the risk of depreciation by an enhancement of the price. Hence, sales were generally made for cash after the depreciation had become considerable. A lender of money could not thus ^indemnify himself against the risk of depreciation, and hence loans of money were rarely made on long credits. And we can well understand how a man having money, and not knowing how to invest it, or being unwilling to incur the hazard or the odium of speculation, might be willing to put it out at interest, and thus avoid some portion of the loss he would otherwise incur by the depreciation. When we remember the confidence which for a long timé w'as felt in the success of the Confederacy, and in the ultimate value of Confederate money and bonds, we can readily believe that, in the summer of 1862, parties would not feel much concern about the depreciation of the money. At any rate, I venture to affirm, as a matter of fact, that nobody who took a note which was intended to be paid at a future day in Confederate notes, either for the sale of property or the loan of money, ever expected to receive, or ever did receive, more than the same nominal sum mentioned in the note, with the interest upon it, unless there was a special contract that he should have more.
It is fallacious, therefore, to assume that justice requires that the notes should be valued at the date of the contract, and not at the day of payment agreed upon, on a presumption that parties, in making their contracts, had reference only to the value of the notes at that time.
But suppose we could make this presumption. When a party sues upon a contract for the payment of money, or for the delivery of a commodity, we look to the promise, and not to the consideration of it, to ascertain the rights and obligations of the parties respectively. If, at a time when wheat is worth one dollar a bushel, a party agrees, in consideration of $1,000 paid in cash, to deliver 1,000 bushels of wheat at the end of. six months, will not 1,000 bushels of wheat satisfy the contract, though it should, at the end of the six months, be worth only fifty cents a bushel? And will not $500 be the full measure of damages *for a breach of the contract? The cases cited from 8 Beigh and 12 Grattan show that the same rule applies to the case of a contract to pay so many dollars in banknotes, and proof of the consideration on which the promise was made would not vary the rule. In an action on a contract, the law does not undertake to give the party the value of the consideration which he advanced, but only to give him what the other agreed to pay for that consideration, whether equivalent to it or not. The position I am considering ignores the contract, and treats the action as if it was upon a quantum valebat, or an action of trover.
The lawful money of the country has a certain and uniform value attributed to it by law. Its actual value, in reference to other things, may fluctuate, by reason of a debasement of the coin, or by the substitution of paper for coin, or by the operation of extrinsic causes, such as an increase in the supply of the precious metals, or political disturbances, or the vicissitudes of commerce. But the legal value of the money, be it coin or paper, remains the same, and a contract for the payment of so many dollars at a future day, will be satisfied by the payment of that number of dollars on the day of payment agreed on, though they may be of less actual value than at the date of the contract. In other words, the depreciation in everj' such case falls upon the creditor. The authorities on this subject are fully collected in Story on Prom. Notes, sect. 390, and note, and sect. 399-395. The same doctrine is laid down in Rhodes v. Bronson, 34 N. Y. R., 649 (655). Whether we treat Confederate notes, therefore, as a commodity or as money, the general rule of *676 law is, that the depreciation in their value between the date of the contract and the day of payment agreed on, must be borne by the creditor. Those who insist that the value of the notes at the date of the contract is the true measure of recovery, regard them neither as a commodity nor as *money, or rather they regard them partly as money and partly as a commodity. They say that a contract on any given day during the war, to pay so many dollars at a future day, has reference to dollars bearing a certain actual value at the date of the contract, and binds the party to pay an equivalent value on the day of payment. Thus far they treat the notes as money, and hold the contract to be a contract for value, and not a contract for quantity. But when the contract is to be fulfilled by payment, or when redress is sought for a failure to fulfill it, they refuse to treat the notes as money. They deny that the contract can be satisfied, or the breach of it compensated for, by the same nominal sum on the day of payment agreed upon, unless it is of the same actual value as at the date of the contract. For the purpose of fixing the liability, they regard the notes as money; for the purpose of discharging it, they regard them as a commodity, to be received only at its actual value.
In order to maintain the right of the legislature to fix th'e date of the contract as the time when the scale should be applied, as a general rule, it has been sáid that this class of contracts should be regarded as foreign contracts, and that such contracts are enforcible in our courts by comity only, and upon such equitable terms as the Legislature may prescribe. I shall not stop to inquire whether these contracts can be justly regarded as foreign contracts, or how far the Legislature may impose terms upon the privilege of enforcing such contracts in our courts. Conceding all that is assumed in this view, it does not serve the purpose for which it is advanced. If the Legislature may require a plaintiff who comes into our courts to enforce a Confederate contract, to submit to equitable terms for the relief and protection of the defendant, how can this authorize the Legislature to enlarge the plaintiff’s rights against the defendant, beyond the legal effect of the contract? *That is what must be maintained to entitle the Legislature to give to the plaintiff the value of the notes at the date of the contract, though by the legal effect of the contract the defendant was only bound for the value at the day of payment agreed on, which might be, and generally was, less than the value at the date of the contract. To do this, the Legislature must have power to do more than impose equitable terms on the plaintiff; it must have power to change the contract by holding the defendant bound for more than he undertook.
The right of the Legislature to refuse a remedy in our courts upon contracts made in another State, or in a foreign country, which, though lawful and valid where made, are inconsistent with our policy, or in fraud of our laws, or of the rights of our citizens, or against good morals, or the like (Story Confi. § 244), is not in conflict with the constitutional provision which forbids the Legislature to impair the obligation of a contract. A contract made in another State, or in a foreign country, is as much within the protection of that provision as a contract made here.
It has been objected, that the views I have been maintaining in reference to these contracts, would result in giving the creditor nothing in those cases in which, at the day of payment agreed on, Confederate notes had ceased to circulate, or to be of any value. If this was so, it would have no legitimate tendency to prove that those views are unsound. It must be observed, however, that the subject of contract, in this class of cases, is paper circulating as currency. It is not merely the paper itself, without its attribute as a currency or circulating medium. If, at the day of payment fixed in such a contract, Confederate notes had ceased to circulate, or to have value as a currency, a tender of such notes in payment would not satisfy the contract. It does not follow, therefore, from what I have said, that, in the case supposed, the creditor *would recover nothing. A different rule must be applied in such cases from that which applies in the cases I have been considering, where, at the day agreed on for payment, the notes continue to circulate and to have value as a currency. There may be some difficult3r in saying what rule should be applied in such cases. It would be premature and improper to determine it in this case, as the question does not arise.
The general rule, therefore, is, that in an action on a contract to pay so many dollars in Confederate notes, the plaintiff is entitled to recover the value of such notes at the day of payment fixed by the contract, and the rule is the same whether the kind of .dollars contracted for is specified on the face of the contract, or is proved by evidence aliunde. The fourth section of the act of March 3, 1866, indicates clearly that such was the understanding of the Legislature. But the statute authorizes the court or the jury, as the case may be, to give the value of the notes at such time as may “seem right” in the particular case. This has reference to the actual understanding and agreement of the parties. Nothing less than such an understanding or agreement, assented to by both parties, is sufficient to overrule the intention of the parties implied by law from the terms of the promise to pay. What evidence may be received for this purpose, it is not now necessary to inquire. A like question, under the act of 1781, gave rise to much difference of opinion. Watson, ex’or, v. Alexander, 1 Wash. 353; Smith v. Walker, 1 Call 39; Boyle & al. v. Vowles, 1 Call 244; Commonwealth v. Beaumarchais, 3 Call 122. Whatever be the range of evidence allowable, the court *677 or the jury must be governed by the agreement and understanding of the parties, and not by their opinion of what is called the “natural justice” of each case.
There is nothing in the facts of this case to show that '“'there was any understanding or agreement between the parties inconsistent with that which the law implies from the terms of the bond, nor anything from which it can be inferred or implied. It is true, that the sum lent consisted of Confederate notes having a certain value at the date of the loan. But there was no contract to return that value at the day of payment. The contract was to return, on the day of payment, the same nominal sum in Confederate notes, let their value be what it might. Besides, it appears that Bearing had no use for the money, and urged Rucker to take it as an accommodation to him. If Bearing,' having no use for the money, had kept it by him, he would have incurred the loss by depreciation, and also the loss of interest. Rucker was reluctant to take it, and only did so at last for the accommodation of Bearing, and at four per cent, interest, with an express stipulation that he should be allowed to pay it on the 1st day of January, 1863. Rucker evidently doubted his ability to make a profit on the money, and had little or no use for it. It would be unreasonable to suppose, under these circumstances, that Bearing expected Rucker to assume the risk of the depreciation, or that Rucker intended to do so. As there had been, according to the table, but little depreciation in the value of the money since the beginning of the year, and none at all since the month of April, it may have been that neither party contemplated that any material depreciation would occur before the first day of January, 1863.
'It remains to refer briefly to the act of 1781, already cited. I will not prolong this opinion by stating all its provisions, or by comparing them in detail with those of the act of March 3, 1866. A few remarks will suffice to show that the latter act departed from the former in some of its leading features, and that the legislature, in making these departures, was governed by a clear and definite “'purpose. Thus the act of 1781 established an arbitrary scale for each month, from January, 1777, to Becember, 1781, inclusive. The act of March, 1866, establishes no arbitrary scale, but leaves the value to be ascertained by the jury. The history of the act of March, 1866, is this: It was first reported to the House of Belegates with an arbitrary scale, not based on gold, for each month from January, 1862, to March, 1865, inclusive. This was struck out, and another scale substituted, by a close vote. This latter scale put the value of the notes at considerably less than the other, and was doTibtless based on gold. The bill passed the House in this form. The Senate asked a committee of conference, which recommended that the scale should be struck out entirely. Their recommendation was adopted, and the bill passed into a law without any scale at all. From inadvertence, probably, the preamble was retained as originally reported, when the bill provided an arbitrary scale for each successive month.
It is impossible to misunderstand the view which thus finally prevailed. An arbitrary scale was inconsistent with the only just object of the law, which was merely to provide means for enforcing, justly and effectually, this class of contracts, according to the rights of the parties, without usurping the functions of the courts and juries, by determining in advance the extent of those rights in any iTa.irlicri.la.ir. The act of 1781 assumed, as a general rule, that the scale ought to be applied at the date of the contract, and so provided. This act was described by Chief Justice Marshall, in Few v. Marsteller, 2 Cranch R. 10, (27,) as “interfering with contracts, and ascertaining their value by a rule different from that adopted by the parties themselves.” The Court of Appeals admitted the scale to be unjust as to some of the periods, (Hite & als. v. Sutherland’s ex’or, 1 Wash. 133,) but it sustained it as ““a law dictated by imperious State necessity, and even by justice, its object being to give to creditors the real value of their nominal contracts. ’ ’ Commonwealth v. Beaumarchais, 3 Call 127. The act of March 3, 1866, avoided the objections that were made against the act of 1781, by leaving both the value of the notes and the time of valuation to be determined in each case by the proper legal tribunals, according to the rights of the parties under the general rules of law.
In consequence of the manifest injustice of applying an arbitrary scale in all cases, the fifth section of the act of 1781 gave the court authority to depart from it, under circumstances which, in its opinion, would render its application unjust. It was held that this provision was designed to meet the real contract where the parties, by their contract, contemplated a different rate of depreciation from that fixed by the act. The circumstances must be such as arise in the contract sued upon, showing that the parties, at the time, contracted on the. idea of no depreciation at all, or of one different from that fixed by the act, and the scale would not be departed from except in a strong case. Begle & als. v. Vowles, 1 Call 244; Commonwealth v. Beaumarchais, 3 Call 122. In other words, the act assumed, as a general rule, that the parties contracted with reference to the value of the money at the date of the contract, but if the contract itself showed that such was not the fact, the general rule might be departed from. A similar provision would not have been appropriafe in the act of 1866, because that act prescribed no fixed scale, and laid down no rule as to the time of valuing the notes. But the same ends of justice were accomplished by leaving the time and the value to be determined in each case according to the real agreement *678 of the parties. There was only this substantial difference, that under the act of 1781 the value at the date of the contract was assumed to be *the proper one, unless it appeared that the parties actually contracted with reference to a different one. Under the act of 1866, nothing is assumed, but the legal construction of the contract will fix the time of valuation unless it appears that the value of a different time was really contemplated and agreed on by the parties; in other words, that the risk of depreciation was to be borne in a different manner from that implied by law from the terms of the contract.
There is a fundamental distinction between Continental money and Confederate money, which will account for the diversities between the act of 1781 and the act of 1866. The former was the lawful money of the country and a legal tender in payment of debts, until the act of December 24, 1781, (10 Hen. Stat. at Large 456,) by which it was called in, and declared to be no longer a legal tender. It had, therefore, a certain and uniform value attributed to it by law. Rvery contract for the payment of that money was a contract for value, and not a contract for quantity only. But as the value of the notes was always the same, in contemplation of law, the law considered that the payment of the same nominal sum called for by the contract was a payment of the same value, though the actual value of the notes may have been less at the time of - payment than at the date of the contract. When the act establishing the scale of depreciation provided a new mode of “settling and ad-justing” such contracts, justice required that their true character as contracts for value should be adhered to, and that the creditor should receive what the contract entitled him to, the value of the notes at the date of the contract.
But as I have said before, Confederate notes were never lawful money, or a legal tender. They were never so declared to be even b3r the laws of the Confederate States. They were a substitute for money, like bank notes, and *like them were only a commodity. A contract to pajr Confederate notes, like a contract to pay bank notes, was a contract for quantity, and not for value, and entitled the creditor onlv to the value at the day of payment of the quantity of notes called for by the contract. It was reasonable and just, apart from all questions of constitutional power, that the Tegislature should conform to the -true character of the contract in providing the means of enforcing it.
Upon the whole, I am of opinion that the judgment of the District Court should be reversed for the error in awarding a venire de novo, but with costs to the defendant in error as the party substantially prevailing, inasmuch as there was no error in the principles laid down in the judgment of said District Court as applicable to the facts of the case, upon the supposition that the bond in the declaration mentioned was pay-. able in Confederate treasury notes ; that the judgment of the Circuit Court should be reversed, with costs to the plaintiff in error in the District Court, and judgment rendered in favor of the plaintiff in error here for the sum of $1,274.42, the value in gold, as of January 1, 1863, of the amount in Confederate notes called for by the bond, with interest at four per cent, per annum from June 14, 1862, the date of the bond, subject to the credit of $400 paid, and his costs in the Circuit Court.